944 F.2d 1131
 15 UCC Rep.Serv.2d 1225
 CASSIDY PODELL LYNCH, INC.
v.
SNYDERGENERAL CORPORATION
Snydergeneral Corporation ("SnyderGeneral"), Appellant.
CASSIDY PODELL LYNCH, INC.
v.
SNYDERGENERAL CORPORATION.
Cassidy Podell Lynch, Inc., Appellant.
 Nos. 90-5765, 90-5770.
 United States Court of Appeals,
Third Circuit.
 Argued April 3, 1991.
Decided Sept. 18, 1991.
Rehearing Denied Oct. 25, 1991.
 
 John L. McGoldrick (argued), Richard M. Eittreim, Lisa M. Goldman, Penelope M. Taylor, McCarter & English, Newark, N.J., for SnyderGeneral Corp.
 Robert W. Forman (argued), Greenberger & Forman, New York City, for Cassidy Podell Lynch, Inc.
 Before MANSMANN and HUTCHINSON, Circuit Judges, and O'NEILL, District Judge*.
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 I.
 
 1
 SnyderGeneral Corporation (Snyder), a manufacturer of industrial air conditioning systems, appeals a judgment for $1,060,000.00 plus attorney's fees entered by the United States District Court for the District of New Jersey in favor of Cassidy Podell Lynch (Cassidy), formerly the distributor of Snyder's products in northern New Jersey and Rockland County, New York. The district court entered the judgment for Cassidy after granting Snyder a $356,200.00 remittitur against a jury verdict of $1,416,200.00 for Cassidy on its claim that Snyder terminated the distributorship in violation of the New Jersey Franchise Practices Act, (the New Jersey Franchise Act), N.J.Stat.Ann. §§ 56:10-1 to 10-29 (West 1989 & Supp.1991). Relying on a provision in its distributorship contract with Cassidy (the Distributorship Agreement) stating termination was permitted on thirty-days' notice, Snyder terminated the Distributorship Agreement without cause effective December 2, 1984.
 
 
 2
 In its cross-appeal, Cassidy sought entry of judgment for $70,000.00 or a new trial limited to damages on Cassidy's additional claim that Snyder breached a contract for the sale of goods to Cassidy. Cassidy's contract claim was separately submitted to the jury on special interrogatories. Cassidy based the contract claim on Snyder's refusal to supply Cassidy with all the air conditioning equipment needed to fulfill a contract Cassidy had made with New Jersey Bell Telephone Company (the New Jersey Bell contract). The jury found that Snyder had wrongfully refused to ship the remaining products Cassidy needed to perform its contract with New Jersey Bell but awarded no separate damages for this claim. Cassidy also cross-appeals a judgment for Snyder for $89,804.00 in damages on Snyder's counterclaim. The $89,804.00 is the balance of the price Cassidy owed Snyder for equipment Snyder had sold and delivered to Cassidy in connection with the New Jersey Bell contract. This judgment was entered on a directed verdict for Snyder on its counterclaim against Cassidy.[1]
 
 
 3
 We hold that the evidence was insufficient for a rational jury to find that the exclusive Distributorship Agreement between Snyder and Cassidy created a "community of interest" as the statute requires. Alternately, we also hold that the parties had not "contemplated" a "fixed business location" in New Jersey as the New Jersey Franchise Act also requires. We will therefore reverse the judgment for Cassidy on its New Jersey Franchise Act claim and remand to the district court with instructions to vacate the $1,060,000.00 judgment for damages on that claim and the $72,770.00 it also awarded Cassidy for attorney's fees as a successful plaintiff under the New Jersey Franchise Act and instead enter judgment in favor of Snyder on its motion for judgment n.o.v. on Cassidy's franchise claim. We will affirm the district court's order directing a verdict for Snyder on its counterclaim for the unpaid price of the goods it sold and delivered to Cassidy. We will remand Cassidy's contract claim to the district court for a new trial limited to damages.
 
 II.
 
 4
 Cassidy initiated this action on October 16, 1985. Its complaint asserted breach of contract, antitrust violations and wrongful termination under the New Jersey Franchise Act. Snyder answered and included in its answer a counterclaim alleging that Cassidy had failed to pay for goods purchased and delivered. After Cassidy's antitrust claims were voluntarily dismissed and Snyder's motion for summary judgment denied, the case proceeded to trial.
 
 
 5
 Snyder moved for a directed verdict at the close of Cassidy's case. Snyder renewed its motion for a directed verdict on Cassidy's franchise claim and Cassidy's New Jersey Bell contract claim at the close of all the evidence. Snyder also moved for a directed verdict on its own counterclaim against Cassidy for breach of contract. Cassidy likewise moved for a directed verdict on its claim under the New Jersey Franchise Act. The district court reserved decision on the motions addressed to the New Jersey Franchise Act but entered judgment against Cassidy on Snyder's counterclaim in the amount of $89,804.00 for Cassidy's failure to pay for goods sold and delivered.
 
 
 6
 The district court submitted special interrogatories to the jury both on Cassidy's New Jersey Franchise Act and its New Jersey Bell contract claims. In answer to the special interrogatories, the jury returned a verdict in favor of Cassidy on its New Jersey Franchise Act claim for $1,416,200.00. The jury also found that Snyder had wrongfully refused to ship the goods remaining on Cassidy's New Jersey Bell contract but did not award Cassidy any separate damages for this refusal.
 
 
 7
 After the jury returned its verdict in favor of Cassidy on the New Jersey Franchise Act claim, Cassidy moved for an award of attorney's fees, for prejudgment interest and to amend the judgment by adding $70,000.00 in compensatory damages on its claim for breach of contract or alternately for a new trial on this claim. Snyder filed post-trial motions for judgment n.o.v. or a new trial on the New Jersey Franchise Act claim and in the alternative sought a remittitur. On August 2, 1990, the court awarded Cassidy $72,770.00 in attorney's fees pursuant to the New Jersey Franchise Act, but denied Cassidy's motion for pre-judgment interest and its motion to add $70,000.00 in damages to the judgment or for a new trial on damages on Cassidy's contract claim. The court denied Snyder's motion for judgment n.o.v. or a new trial but granted it a remittitur from $1,416,200.00 to $1,060,000.00.
 
 
 8
 Snyder filed a Notice of Appeal on September 4, 1990, and Cassidy filed its notice of cross-appeal two days later. Snyder appeals those parts of the district court's orders denying its motions for judgment n.o.v. or a new trial on Cassidy's franchise claim, the award of attorney's fees on Cassidy's franchise claim, the sufficiency of the remittitur and the entry of judgment for Cassidy in the amount of $1,132,770.00. Cassidy appeals from the amount allowed for attorney's fees, the directed verdict for $89,804.00 on Snyder's counterclaim, the denial of its motion for prejudgment interest and the denial of its motion to add $70,000.00 to the judgment or grant it a new trial on its claim that Snyder breached its contract to supply the equipment needed for Cassidy's New Jersey Bell contract. A Consent Order Staying Execution on Judgments Pending Appeal was entered by the district court on September 13, 1990. On October 16, 1990 the parties stipulated that Snyder would assume the role of appellant and Cassidy the role of appellee.III.
 
 
 9
 Snyder, a manufacturer of air conditioning systems for industrial use, purchased the Climate Control Division of the Singer Company in 1982. Cassidy had been the exclusive manufacturer's sales representative in Northern New Jersey and Rockland County, New York for the Singer Company's air conditioning and heating products. Cassidy continued to act for Snyder in the same capacity. The service vehicles and uniforms of Cassidy's employees bore the Snyder logo, but Cassidy managed its own sales force, made its own decisions about hiring and firing and solicited new customers on its own. Most of Cassidy's income was derived from the sales and servicing of Snyder's products, and Snyder policies prohibited Cassidy from carrying directly competing products. Cassidy could, and did, sell other lines of products which were not directly competitive with Snyder's products.
 
 
 10
 Cassidy had no office or place of business in New Jersey. It ran its distributorship from a New York City location.[2] Cassidy used the New York address on correspondence relating to its New Jersey business, and all its orders were processed through the New York City office. Cassidy's New Jersey salesmen operated out of their own New Jersey residences. The record does show that Cassidy used a Clifton, New Jersey repair facility to repair Snyder products, but there were no secretaries or office personnel at that location and Cassidy processed no orders there.
 
 
 11
 In April, 1984, Snyder and Cassidy executed a Distributorship Agreement renewing Cassidy's exclusive distributorship in parts of New Jersey and New York for a term of one year but subject to earlier termination at Snyder's option on thirty days' notice. The termination provision read:
 
 
 12
 The term of this Agreement ... shall automatically expire on March 31, 1985. This Agreement may be earlier terminated by either party upon thirty (30) days' written notice to the other. [Snyder] shall have the right to appoint a new representative during this (30) days' notice period.
 
 
 13
 Distributorship Agreement, p 2. Under the Distributorship Agreement, Cassidy's New Jersey corporation acted as Snyder's exclusive representative in northern New Jersey and Rockland County, New York for the solicitation, promotion and servicing of certain air conditioning products used primarily in office buildings, hotels, hospitals, schools and similar commercial structures.
 
 
 14
 Cassidy acquired the Snyder products it needed in two ways. The Distributorship Agreement itself called for and governed a commission sales arrangement. Id., p 4. Snyder also permitted Cassidy to make direct purchases for resale to customers that were not governed by the Distributorship Agreement. Id., p 14. Instead, the resale purchases were governed by rules set out from time to time in Snyder's sales manual. Contracts for resale purchases were made through purchase orders with a $15,000.00 ceiling on the amount that could be purchased in a single order. This limitation was also contained in Snyder's sales manual.
 
 
 15
 On August 27, 1984, Cassidy offered to supply New Jersey Bell with Snyder air conditioning equipment to replace the existing Climate Control system at New Jersey Bell's main place of business in Newark, New Jersey. New Jersey Bell gave the contract to Cassidy. To meet this contract, Cassidy needed to buy Snyder equipment for delivery in installments beginning in February, 1985, for Snyder prices totaling $350,000.00. New Jersey Bell was to pay Cassidy $680,371.60.
 
 
 16
 On November 2, 1984, Snyder acquired McQuay Incorporated, another manufacturer of industrial size heating and air conditioning equipment, and immediately sent out notices to thirty-six of its sales representatives, including Cassidy. These notices advised the current representatives that they were being replaced by other sales representatives, most of whom were part of the McQuay marketing organization. The November 2, 1984 letter to Cassidy served as notice that the Distributorship Agreement would be terminated thirty days thereafter.
 
 
 17
 After Cassidy received the termination letter, Snyder agreed to sell it the equipment it needed to fill the New Jersey Bell contract. Cassidy and Snyder divided New Jersey Bell's large single order into more than twenty smaller purchase orders so that the amount of each order would meet the purchase order ceiling of $15,000.00 set in Snyder's then current sales manual. Snyder began the installment deliveries as Cassidy required them. Cassidy did not pay for them in the thirty days that the purchase order and sales manual called for, but Snyder continued timely deliveries of all but the last six orders. After a flurry of correspondence relating to late payment, Snyder refused to ship the last six remaining orders Cassidy needed to fulfill its contract with New Jersey Bell on any payment terms other than C.O.D., cash on delivery, despite the fact that Cassidy had made payments of $250,000.00 for products delivered by Snyder during 1985. Cassidy objected strenuously to the new payment terms, demanded delivery on what it considered its customary credit arrangements of ninety-days open term and, when Snyder refused, filed the complaint beginning the instant action.
 
 IV.
 
 18
 The district court had diversity jurisdiction over this action pursuant to 28 U.S.C.A. § 1332(a) (West Supp.1991).[3] We have appellate jurisdiction over the final order of the district court pursuant to 28 U.S.C.A. § 1291 (West Supp.1991).
 
 
 19
 Our review of the district court's order directing a verdict for Snyder on its counterclaim for breach of contract and denying Snyder's motion for judgment n.o.v. on Cassidy's franchise claim is plenary. Macleary v. Hines, 817 F.2d 1081, 1083 (3d Cir.1987) (directed verdict); see Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1273 (3d Cir.1979) (in banc) (judgment n.o.v.). In reviewing the directed verdict, we consider whether "viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." Macleary, 817 F.2d at 1083 (citations omitted). In reviewing a district court order denying a motion for judgment n.o.v., we "view all the evidence and inferences reasonably drawn therefrom in the light most favorable to the party with the verdict ... [and] ascertain from a review of the record whether there is sufficient evidence to sustain the verdict of the jury." Chuy, 595 F.2d at 1273 (citation omitted).
 
 
 20
 The district court's denial of the parties' motions for a new trial is reviewable for abuse of discretion. See American Bearing Co. v. Litton Indus., 729 F.2d 943, 948 (3d Cir.), cert. denied, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984).
 
 V.
 
 21
 On the merits, we consider first the question whether the Distributorship Agreement between Snyder and Cassidy and their conduct of business under it created a franchise relationship protected by the New Jersey Franchise Act. Whether the relationship between Cassidy and Snyder was a franchise within the meaning of the New Jersey Franchise Act presents a mixed question of fact and law. To determine whether Cassidy had the status of a franchisee we undertake a two-step analysis. At the first step, we must decipher the meaning of the conditions the New Jersey Franchise Act imposes on creation of a franchise. That is a question of statutory construction and our review is plenary. See New Jersey Am., Inc. v. Allied Corp., 875 F.2d 58, 59 (3d Cir.1989). After we identify and define the statutory requirements that apply to this case, we must go on to decide whether the evidence presented was sufficient to permit a rational jury to find that the conditions the statute imposes were present in Cassidy and Snyder's relationship. This requires an examination not only of the language of the Distributorship Agreement but also the parties' practices under it. In making the sufficiency determination, we resolve all conflicts in the evidence in favor of Cassidy, the verdict winner, and also give Cassidy the benefit of any rational inferences that can be drawn from the evidence the jury had before it. See Chuy, 595 F.2d at 1273.
 
 
 22
 Our analysis of whether Cassidy is entitled to protection under the New Jersey Franchise Act is not controlled by the provision in the Distributorship Agreement that would give Snyder the right to terminate their contractual relationship without cause on thirty-days' written notice. If the New Jersey Franchise Act applies, Cassidy and Snyder's relationship could only be terminated for cause. See N.J.S.A. § 56:10-5 (West 1989). Two sections in the New Jersey Franchise Act define and limit a protected franchise. The first is the general definitional section. See id. § 56:10-3(a) (West 1989). The second imposes specific minimum requirements and limits the general definition. See id. § 56:10-4 (West 1989).
 
 A.
 
 23
 The New Jersey Franchise Act's general definitional section requires, inter alia, a "license" permitting use of the franchisor's trade name and a "community of interest" between the parties. It reads:
 
 
 24
 "Franchise" means a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.
 
 
 25
 Id. § 56:10-3(a). If the parties' relationship meets this general definition, it must then meet the New Jersey Franchise Act's specific requirements concerning place of business, earnings and percentages of sales:
 
 
 26
 This act applies only to a franchise (1) the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey, (2) where gross sales of products or services between the franchisor and franchisee covered by such franchise shall have exceeded $35,000.00 for the 12 months next preceding the institution of suit pursuant to this act, and (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise.
 
 
 27
 Id. § 56:10-4.
 
 
 28
 Snyder contends that it did not grant Cassidy a "license" within the meaning of § 56:10-3(a). The Distributorship Agreement provides as follows: Cassidy "agrees to use its best efforts to diligently promote the sale of the Products under the applicable CLIMATE CONTROL trademarks"; Cassidy shall "[s]olicit orders for the Products only under trademark and model designations authorized by CLIMATE CONTROL"; Cassidy will "[m]aintain suitable listings in major area telephone directories in the Territory under the trademarks"; and Cassidy "will not use or display the [trademarks] ... except upon specifying that it is acting as a sales representative of CLIMATE CONTROL for the Products to the extent and in the manner authorized in writing by CLIMATE CONTROL." Distributorship Agreement, pp 1, 5(a), 5(n) & 8. Snyder also provided Cassidy with decals and uniform logos containing Snyder trademarks and Cassidy used the Snyder trademarks in its advertising materials.
 
 1.
 
 29
 The Appellate Division of the Superior Court of New Jersey has construed the term license in the New Jersey Franchise Act as follows:
 
 
 30
 [The] hallmark of the franchise relationship is the use of another's trade name in such a manner as to create a reasonable belief on the part of the consuming public that there is a connection between the trade name licensor and licensee by which the licensor vouches, as it were, for the activity of the licensee in respect of the subject of the trade name.
 
 
 31
 Neptune T.V. & Appliance Serv., Inc. v. Litton Microwave Cooking Prods. Div., 190 N.J.Super. 153, 462 A.2d 595, 599 (1983), quoted in New Jersey Am., 875 F.2d at 61.
 
 
 32
 Courts applying the New Jersey Franchise Act's definition of license have held that if a manufacturer merely furnishes advertising materials to a distributor, and allows the distributor to place its name alongside the manufacturer's name on such materials, a license is not created within the meaning of the New Jersey Franchise Act. See Finlay & Assocs., Inc. v. Borg-Warner Corp., 146 N.J.Super. 210, 369 A.2d 541, 545-46 (1976) ("Obviously, someone who sells a product has to, or wants to make known that he has it."), aff'd, 155 N.J.Super. 331, 382 A.2d 933 (1978) (per curiam), certif. denied, 77 N.J. 467, 391 A.2d 483 (1978).
 
 
 33
 In two cases distributorship agreements similar to the present case were held not to create a license. In Colt Indus., Inc. v. Fidelco Pump & Compressor Corp., 844 F.2d 117 (3d Cir.1988), we dealt with an appeal from the district court's denial of a preliminary injunction. Fidelco Pump & Compressor Corporation (Fidelco) sought to prevent Colt Industries, Incorporated (Colt) from terminating its non-exclusive distributorship agreement. Id. at 118. The agreement allowed Fidelco to display Colt's tradename consistently with Colt's advertising policies, and to indicate that Fidelco was a distributor of Colt products, but did not allow Fidelco to use Colt's tradename in Fidelco's own tradename. Id. at 119. We also stated, "if this limited agreement constitutes a license to use a trademark, then any business selling a name brand product would, under New Jersey law, necessarily be considered as holding a license." Id. at 120.
 
 
 34
 For similar reasons, the Superior Court of New Jersey, Appellate Division, held no license was created in Instructional Sys., Inc. v. Computer Curriculum Corp., 243 N.J.Super. 53, 578 A.2d 876 (1990) (per curiam). Instructional Systems, Inc. (Instructional) served as an exclusive regional seller of computer hardware and software products under an agreement with Computer Curriculum Corporation (CompCorp). Under the agreement, Instructional agreed to use its "best efforts" to promote CompCorp's name, trademark and products, and the agreement authorized Instructional to use CompCorp's name and trademark in its advertising and to train customers in the use of CompCorp's products. Id. 578 A.2d at 877, 880. The court found that none of these activities "would allow a customer to conclude that there is a special connection between [CompCorp] and [Instructional] of the type found in genuine franchise agreements.... [Instructional] is merely an independent contractor that happens to sell [CompCorp] products." Id. at 880-81.
 
 
 35
 There are additional elements in the Cassidy-Snyder relationship, however, which we believe allowed the jury to find that Snyder had granted Cassidy a license within the meaning the New Jersey Franchise Act gives that term. First, Snyder designated Cassidy as an authorized warranty repair center for its product pursuant to a detailed Repair Depot Agreement that required Cassidy to maintain facilities and equipment, perform service in a workmanlike manner and follow detailed inspection, repair and invoicing procedures.[4] Snyder required Cassidy to maintain advertisements in the yellow pages proclaiming itself as an authorized seller of and repair center for Snyder's Climate Control systems. Cassidy also maintained signs bearing Snyder's tradename at its Clifton repair facility, and its servicemen wore uniforms bearing the tradename and drove trucks with decals provided by Snyder. In Neptune T.V., the Superior Court of New Jersey, Appellate Division, found that an electronics manufacturer (Litton) had granted a license to an appliance center (Neptune) because Neptune was designated by Litton as "an authorized Litton service source" under a written agreement that incorporated a detailed "Service Policy and Procedural Guide" similar to that in the present case. Neptune T.V., 462 A.2d at 597. The court found a license agreement because "Litton gave its imprimatur to Neptune's business enterprise in respect of Litton's product and induced the consuming public to expect from Neptune a uniformly and [sic] acceptable and quality controlled service endorsed by Litton itself." Id. at 599; see also Instructional Sys., Inc., 578 A.2d at 880 (fact that distributor was not official warranty service source for manufacturer significant factor in court's finding of no license).
 
 
 36
 A second fact distinguishing this case from Colt Industries and CompCorp is Snyder's requirement that Cassidy employees do a "check, test and start" examination on each Snyder unit sold and installed to insure its proper function. This procedure was defined by Snyder as "an important marketing tool to reduce call backs and certain types of collection activities which impact productive selling time." Joint Appendix (App.) at 436. Based on this evidence, a reasonable jury could find a connection between Snyder and Cassidy substantial enough in the eyes of the consuming public to meet the New Jersey Franchise Act's definition of a license.
 
 2.
 
 37
 Not every licensee is a franchisee within the meaning of the New Jersey Franchise Act, however. There must also be a "community of interest" between the parties. New Jersey Am., 875 F.2d at 63. The community of interest element supplies the factor needed to take the relation covered by the New Jersey Franchise Act out of the "general rule that two businesses are free to terminate their business relationship according to the terms of their contract." Id. at 61. The statute itself does not define the term "community of interest," and the Supreme Court of New Jersey has yet to do so. We must, therefore, look to the cases decided by the Superior Court of New Jersey, Appellate Division, this Court's case law on the New Jersey Franchise Act, the New Jersey Franchise Act's legislative history, and the economics of franchise arrangements.
 
 
 38
 This Court and the Superior Court of New Jersey, Appellate Division, have considered the statutory phrase "community of interest" on several occasions. These decisions have focused on several factors in defining community of interest. They include: (1) licensor's control over the licensee, (2) the licensee's economic dependence on the licensor; (3) disparity in bargaining power, and (4) the presence of a franchise-specific investment by the licensee. We will consider each of these factors in our analysis.
 
 
 39
 In Colt Industries, after concluding that Fidelco had not been granted a license in the sense contemplated by the New Jersey Franchise Act, we addressed the community of interest element and held that Fidelco had also failed to satisfy its burden on that issue. Colt Indus., 844 F.2d at 121. Although Colt Industries is distinguishable, inter alia, because the distributorship was non-exclusive, its discussion of the meaning of the statutory phrase "community of interest" is still instructive. Even though the parties in Colt Industries, like the parties here, were engaged in the pursuit of a shared goal, we agreed with the district court that the relationship between Colt and Fidelco lacked a "community of interest." We said:
 
 
 40
 The district court ... determined that Fidelco, even if it was granted a license by Colt, failed to ... demonstrat[e] a community of interest in the marketing of goods and services between itself and Colt.
 
 
 41
 [Under the Franchise Act courts] have looked for specific proof, focusing on certain indicia of control by the supposed franchisor over the supposed franchisee.
 
 
 42
 The district court, based upon its findings of no indications of interdependency or control, properly concluded that the relationship between Fidelco and Colt was a cooperative one.
 
 
 43
 Id. at 120 (citations omitted). We went on to note some specifics in Colt Industries. There, the record showed that cooperation in marketing and use of Colt's promotional materials was suggested, not required. Additionally, Colt-sponsored sales meetings held at Fidelco's place of business were not mandatory, Colt did not mandate a particular method in selling its products and Colt did not set the sales quotas typical to a franchise arrangement, but instead relied on sales monitoring practices typically used by any sensible manufacturer contemplating sales on credit. Id. at 120-21. Fidelco "failed to establish that it was subject to the whim, direction and control of a more powerful entity whose withdrawal from the relationship would shock a court's sense of equity." Id. at 120-21.
 
 
 44
 Cassidy's Distributorship Agreement has the following provisions controlling marketing practices:
 
 
 45
 5(d) Conduct a vigorous program of promotion throughout the territory, including general displays, demonstrations, up-to-date mailing lists, trade show displays, and such other promotional activities as may be appropriate.
 
 
 46
 ....
 
 
 47
 (n) maintain suitable listings in major area telephone directories in the territory under [Snyder] trademarks.
 
 
 48
 Distributorship Agreement, pp 5(d), 5(n). We recognize that the Distributorship Agreement in this case is otherwise somewhat more confining than the one we considered in Colt Industries. Cassidy representatives were required to attend one annual sales meeting and training programs provided by Snyder, as well as to meet mutually agreed upon sales quotas. Id., p 5(c). The record also shows that Snyder had a detailed sales policy manual on customer orders and credit terms, but that Cassidy had the option of selecting direct mail, telephone or other means to approach the customer. Once Cassidy submitted an order and Snyder accepted it, Cassidy dealt with the customer without control or interference from Snyder. Though this Distributorship Agreement does not leave Cassidy wholly free from marketing controls, we do not think they are themselves so burdensome as to create the unfettered control typically present in a franchise relationship.
 
 
 49
 The factor of "economic dependence" was the focus of the community of interest analysis by the Superior Court of New Jersey, Appellate Division, in Neptune T.V. In Neptune T.V., the Appellate Division held that the existence of a licensed service center and service contract between the parties did not involve a community of interest for the purposes of the New Jersey Franchise Act, and therefore no franchise relationship existed. Neptune T.V., 462 A.2d at 603. In holding that the requisite community of interest requirement was absent, the Appellate Division first noted that the phrase was undefined by the statute and that other New Jersey courts had not addressed the definition. Id. at 599. The court therefore turned to franchise laws in other jurisdictions and reasoned that:
 
 
 50
 [T]he community of interest signalling the franchise relationship does not imply a sharing of profits. Rather it is based on the complex of mutual and continuing advantages which induced the franchisor to reach his ultimate consumer through entities other than his own which, although legally separate, are nevertheless economically dependent upon him.
 
 
 51
 Id. at 600-01 (citation omitted); see also New Jersey Am., 875 F.2d at 63 (highly relevant that licensee's dependence on licensor "quite limited"); Colt Indus., 844 F.2d at 120 (no indications of interdependency between parties).
 
 
 52
 The New Jersey court's emphasis on economic dependence is instructive. Although we recognize that Cassidy was in a more vulnerable position than Neptune because Snyder was Cassidy's predominant supplier,[5] we do not think reliance on a single supplier automatically qualifies a distributor for protection under the New Jersey Franchise Act. If it did, all exclusive distributors could unilaterally decide to convert their distributorships into franchises without regard to the shared intent of the parties in entering into the distributorship agreement.
 
 
 53
 In Colt Industries and more recently in New Jersey American, we also referred to a disparity in bargaining power as a factor favoring existence of a franchise. In New Jersey American, we said that "[t]he test to be devised is, of course, a caliper for measuring putative inequality of bargaining power, which is what the community of interest test, in effect, seeks to measure." New Jersey Am., 875 F.2d at 59. We noted that the relationship in Colt Industries was marked by equal bargaining power and that factor contributed to our conclusion that a community of interest was not established. Colt Indus., 844 F.2d at 120-21. The Superior Court of New Jersey, Appellate Division, also recognized this disparity in Neptune T.V. It said:
 
 
 54
 Once a franchisee has succeeded by his efforts and capital in establishing a local reputation for the franchise name, he is vulnerable to termination of the franchise, forfeiture of the business good will and the inability to realize the benefits of his business by selling it to another prospective franchisee. Thus, the reputation and good will of the network, created primarily by the effort[s] of the individual franchisees, passes back to the franchisor without compensation to the franchisee.
 
 
 55
 Neptune T.V., 462 A.2d at 601.
 
 
 56
 The unequal bargaining power material to community of interest analysis in franchise cases differs from the pre-existing disparity in bargaining power that leads to a refusal to enforce adhesive contracts. A franchisee does not enter the relation dependent on a franchisor. He becomes dependent as a result of the relation itself. Thus, the unequal bargaining power that concerns us in the franchise context arises when the relation between licensee and licensor has incidents that induce or require the licensee to invest in skills or assets that have no continuing value to the licensee if the license is terminated.
 
 
 57
 In Neptune T.V., the New Jersey court also considered it significant that Neptune, as a firm that repaired appliances manufactured by many firms other than Litton, did not have any significant specific investment in capital equipment that could only be used to repair Litton appliances. Neptune T.V., 462 A.2d at 603.
 
 
 58
 In New Jersey American, we further refined our definition of "community of interest." There, we assessed the relationship between New Jersey American, Incorporated (New Jersey American), an assembler of automobile brake pads and drum shoes sold in the automotive replacement parts market, and Allied Corporation (Allied). Allied supplied New Jersey American with Bendix brake linings under a distributorship agreement. The linings supplied by Allied were an essential part of New Jersey American's composite product and, with Allied's permission, New Jersey American advertised its product using the Bendix trade name. New Jersey Am., 875 F.2d at 59. After supplying New Jersey American with Bendix products for six years, Allied terminated the relationship, and New Jersey American brought suit for violation of the New Jersey Franchise Act, alleging termination without good cause. Id. at 60.
 
 
 59
 Although there was enough evidence for a jury to find that Allied had granted New Jersey American a license to use the Bendix name, the district court held the evidence was insufficient to permit a jury to find a community of interest between the two parties. It held that New Jersey American had not established economic dependence on Allied because it could still purchase linings from other manufacturers and had done so in the past. Id. at 61. We affirmed, holding that a reasonable factfinder could not conclude that New Jersey American was a franchisee because the community of interest contemplated by the New Jersey Franchise Act did not exist between the parties. Id. at 65.
 
 
 60
 In affirming the district court in New Jersey American, we revisited and quoted Colt Industries' focus "on certain indicia of control by the supposed franchisor, over the supposed franchisee." Id. at 62 (quoting Colt Indus., 844 F.2d at 120). We further noted, however, that the structure of a franchisee's investment, and franchise-specific capital assets, which have little or no use outside the particular franchise, were important additional factors in determining whether the New Jersey Franchise Act applies. Id. at 63-64. We stressed the fact that "[New Jersey American] presented no evidence that it was required to undertake substantial specific tangible or intangible investments in Allied's business." Id. at 63-64; see Neptune T.V., 462 A.2d at 603 (significant that Neptune did not have any specific investment in capital equipment that could only be used to repair Litton appliances). Allied "had no more leverage over [New Jersey American] than would any company that [New Jersey American] had anticipated would continue to supply it with components." Id. at 64. This, in combination with the other factors mentioned above, "satisfied [the Court] that [New Jersey American] simply was not in the type of vulnerable position that motivated the New Jersey legislature to pass the Franchise Practices Act." Id. at 65; see Westfield Centre Service, Inc. v. Cities Serv. Oil Co., 86 N.J. 453, 432 A.2d 48, 53 (1981) (inequities which legislature was trying to correct under Act resulted from an unequal bargaining power of the parties leading to unconscionable termination provisions that imperiled innocent franchisees with substantial losses of their investments).
 
 
 61
 Based on these cases, Snyder contends that the community of interest the New Jersey Franchise Act requires exists only when the franchisee makes a substantial capital investment in the franchise business. Brief for Appellant/Cross-Appellee Snyder at 25-31. Cassidy contends that "[t]here is no support for Snyder's argument that the [Franchise Act] is applicable only to businesses that make a substantial capital investment in a fixed location and operate under widely-recognized trade names." Brief for Appellee/Cross-Appellant Cassidy at 3 (citation omitted).
 
 
 62
 We do not wholly reject Cassidy's contention.[6] Neither do we entirely accept Snyder's argument that a substantial capital investment in a fixed location is necessary to create a community of interest.[7] Instead, we infer from the case law discussed that a community of interest exists when the terms of the agreement between the parties or the nature of the franchise business requires the licensee, in the interest of the licensed business's success, to make a substantial investment in goods or skills that will be of minimal utility outside the franchise. The risk of losing this investment, at the option of a licensor, is highly likely to unbalance the bargaining scales in his favor. We think, therefore, that the disparity of bargaining power so created in the licensor's favor is a key factor transforming a mere license into the property interest the New Jersey Franchise Act creates and protects. The Act's prohibition against the termination of a franchise without cause insulates the franchisee from the ability of a licensor to deprive a licensee, without so much as a "by your leave," of the investment the licensee has made in the parties' common interest to maximize the individual profits of their symbiotic enterprises.
 
 
 63
 Accordingly, we think the New Jersey Franchise Act was intended to reach the inherently unfair inequality of bargaining power between a licensor and licensee that is peculiar to a business arrangement under which one party loses his bargaining power because the arrangement causes a licensee to become economically dependent on a licensor who can then unilaterally deprive the dependent licensee of a substantial investment that has little or no utility once the license is terminated. See Neptune T.V., 462 A.2d at 601.
 
 
 64
 We do not believe, however, that a licensee must always invest money or tangible assets in order to attain the status of a franchisee. For example, we think a licensee's investment could be in the years of effort required to gain specialized skills or knowledge valuable to market the licensed product efficiently, but of little use beyond that. Such investment, coupled with controls that bind more tightly than those Snyder imposed on Cassidy, could leave a licensee, in a practical sense, without bargaining power over the terms under which the license will continue or whether it will continue at all. We think the New Jersey Franchise Act could also protect that kind of relation against a franchisor's unilateral termination and a franchisee's consequent loss of a franchise-specific investment.
 
 
 65
 In such a situation, the New Jersey Franchise Act prohibits a person who has obtained a significant advantage in bargaining power over the other party to the relation as a consequence of their marketing relation from ending the relation without cause. It prohibits a franchisor from treating his franchisees as exchangeable unless their investment in the franchise is also exchangeable.
 
 
 66
 A requirement that a licensee claiming franchise status must show a significant franchise-specific investment useless to it if the franchise were terminated without cause is a principled way to avoid the undue interference with the freedom of the licensor and licensee to fashion their own contract that an unlimited extension of the New Jersey Franchise Act's protection would entail. On the other hand, if the licensee's specific investment in goods or skills is transferable, i.e. useful beyond the relation the contract in question creates, the licensor and licensee have separate, not common, interests in their investments in the licensed business, and we believe the New Jersey Franchise Act does not apply.
 
 
 67
 In this case, Cassidy has not presented any evidence that it made a franchise-specific capital investment of either goods or services. When Snyder sent out its termination notice, Cassidy was in the business of selling and servicing air conditioning equipment in New Jersey. The knowledge and customer base that Cassidy acquired during its relationship with Snyder is not franchise-specific. It is transferable. Cassidy's knowledge of the air conditioning business and its customer base can be used to sell and repair other brands of air conditioners, as well as other similar refrigeration or heating equipment. Cassidy's customer base is transferrable since Snyder did not interfere with or control Cassidy's customer contacts. Snyder did not prevent Cassidy from conducting business with other manufacturers unless it was in direct competition with a particular Snyder product. During its relationship with Snyder, Cassidy sold similar, although not directly competitive, equipment as a representative for manufacturers other than Snyder. Neptune T.V. makes it clear that the value of any favorable recognition Cassidy may have built up for Snyder's brand name is not the kind of investment that creates a franchise, even though Cassidy's use of the Snyder name satisfied the statute's "license" requirement. See Neptune T.V., 462 A.2d at 603. Although Snyder products were a substantial part of Cassidy's sales, Cassidy's reliance on Snyder as a supplier was self-imposed. "[Cassidy] was not the source of [Snyder's] business; rather, [Snyder] was the source of [Cassidy's] trade." Id., 462 A.2d at 603.
 
 
 68
 The only capital this record shows Cassidy put into the distributorship was in the depot for repair of the Snyder products Cassidy sold. The existence of a repair facility for warranty work, absent other investment, does not create a "community of interest" under the New Jersey Franchise Act, a point we specifically mentioned in Colt Industries. There, we said:
 
 
 69
 [A]lthough the agreements provided for warranty service by Fidelco, the fact that a distributor provides warranty service, standing alone, does not create a "community of interest" within the contemplation of the New Jersey statute.
 
 
 70
 Colt Indus., 844 F.2d at 121 (citing Neptune T.V., 462 A.2d at 603). Like Fidelco, the distributor in Colt Industries, Cassidy provided warranty service at a New Jersey location during part of the term of its relationship with Snyder. Under Colt Industries, this does not trigger the New Jersey Franchise Act. The existence of a repair facility for warranty work is also insufficient to meet the New Jersey Franchise Act's place of business test.
 
 B.
 
 71
 Besides its failure to prove the New Jersey Franchise Act's general community of interest requirement, Cassidy has not shown that its "place of business" comports to the statute's minimum specific requirements. The New Jersey Franchise Act states it applies only to a "[franchise] ... the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey." Id. "Place of Business" is defined as:
 
 
 72
 [A] fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services. Place of business shall not mean an office, a warehouse, a place of storage, a residence or a vehicle.
 
 
 73
 Id. § 56:10-3(f). Even if the licensee's investment of goods, skills or knowledge acquired in the common interest is not usable outside the franchise business, the New Jersey Franchise Act does not protect it unless the business associated with the franchise meets the statute's specific threshold requirement as to place of business.
 
 
 74
 The district court held that Cassidy had no statutory place of business but left it to the jury to decide if Cassidy and Snyder "contemplate[d]" a place of business as the New Jersey Franchise Act defines place of business. It did so on a record showing only that it was "possible" to sell and demonstrate Snyder products from sales facilities in New Jersey. This "possibility" does not square with the statutory term "contemplates." Instead, we believe that the statute requires Cassidy to produce evidence sufficient to show that Cassidy and Snyder had in mind the type of business facility the statute defines, either initially, or later as their relationship evolved under the series of succeeding distributorship agreements that ended with the one in question here.
 
 
 75
 To hold that the present record permits a jury to find the parties contemplated a fixed place for the sale of Snyder's products would insinuate a sales facility out of the imagination and into the world of economic reality from where it could flicker in and out of the imagination by a continuing application of mental legerdemain. At the very least, Cassidy attenuates the term "contemplates" into the term "permits" or the phrase "foresees as a possibility." We construe "contemplates" to mean consideration of a fixed business location for the sale of the franchisor's products. See Colt Indus., Inc. v. Fidelco Pump & Compressor Corp., 700 F.Supp. 1330, 1334 n. 4 (D.N.J.1987) (specific location expressly referred to in parties' agreement), aff'd, 844 F.2d 117 (3d Cir.1988). The franchise specific investment needed to create a community of interest is logically related to the statute's specific requirement that a franchise cannot exist unless there is a "place of business" that the parties' agreement "contemplates." See N.J.Stat.Ann. § 56:10-4. The fixed place of business shows the franchisee is at least willing to make a minimal tangible investment in the business of selling the franchised good or service and it shows the public there is some degree of permanency in the relation between the seller and his supplier.
 
 
 76
 Since the place of business "contemplate[d]" has to be fixed, and must be dedicated, at least in part, to the display or sale of goods, see id. § 56:10-3(f), this record does not show that Snyder "contemplated" selling its products in the type of facility Cassidy provided.[8] Cassidy has produced no evidence that Snyder had in mind displaying and marketing its products out of Cassidy's Clifton, New Jersey repair and warehouse facility. The Repair Depot Agreement is entirely separate from the Distributorship Agreement. In fact, no customer ever visited the facility and no orders were ever processed there during its two year existence. All that Cassidy has shown is that the parties, in formulating the Distributorship Agreement, contemplated a place where salesmen could drop off their orders, not a place where goods would be displayed or offered for sale.[9] The fact that the record reveals that an air conditioning unit could be easily displayed in any space with electrical power is not enough to show the parties contemplated a place of business in New Jersey within the meaning of the statute. See Business Incentives Co. v. Sony Corp., 397 F.Supp. 63, 68 (S.D.N.Y.1975) (showroom rather than a sales office is required by "place of business" provision of New Jersey's Franchise Act). While we recognize the term "contemplates" removes any statutory requirement that the agreement itself expressly or impliedly require Cassidy to procure such a place and suggests it would have been enough for Cassidy to have shown that Snyder knew Cassidy was likely to invest in a salesroom at a fixed location in an effort to promote the parties' community of interest, there is no evidence to show that here. For these reasons, the order of the district court denying Snyder's motion for judgment n.o.v. on Cassidy's New Jersey Franchise Act claim will be reversed.[10]
 
 VI.
 
 77
 We turn now to Cassidy's cross-appeal and the parties' state law breach of contract claims. They are controlled by the New Jersey Uniform Commercial Code (N.J. U.C.C.). In its initial complaint, Cassidy alleged that Snyder breached its purchase agreement with Cassidy by failing to deliver to Cassidy certain equipment that it was obligated to deliver for resale under its contract with New Jersey Bell. Snyder denied Cassidy's allegations and counterclaimed against Cassidy for $87,606.92 for the price of equipment sold and delivered on the New Jersey Bell contract. In answering special interrogatories, the jury found that Snyder had wrongfully refused to ship the remaining equipment Cassidy needed to perform its contract with New Jersey Bell, but awarded Cassidy no separate damages on this claim.
 
 
 78
 In its cross-appeal, Cassidy originally sought entry of judgment for $70,000.00 for lost profits or a new trial on the issue of damages resulting from Snyder's breach of contract. Cassidy also cross-appeals the order of the district court awarding Snyder $89,804.00 in damages on its counterclaim by way of a directed verdict.
 
 A.
 
 79
 We take up first Cassidy's claim that it is entitled to judgment or a new trial on its claim for profits it says it would have realized on the New Jersey Bell contract if Snyder had not failed to deliver all the equipment ordered to fulfill that contract.
 
 
 80
 As a preliminary matter, we recognize that the twenty-three purchase orders submitted by Cassidy to Snyder for equipment Cassidy had promised to sell to New Jersey Bell made up a single installment contract. Section 2-612 of the N.J. U.C.C. defines an installment contract as "one which requires or authorizes the delivery of goods in separate lots to be separately accepted." N.J.Stat.Ann. § 12A:2-612 (West 1962). The separate purchase orders used by Cassidy were merely a device to comply with the $15,000.00 per order limitation Snyder imposed. Eugene Nervina, President and co-owner of Cassidy, testified at trial that the total New Jersey Bell order of approximately $350,000.00 was divided into separate orders to comply with this limitation.
 
 
 81
 Cassidy claims that Snyder breached the contract by failing to deliver the six final installments of the equipment it needed, and this resulted in a $75,000.00 loss of profit on the New Jersey Bell contract. Although the jury determined that Snyder did breach the contract, it awarded Cassidy no damages. Upon a finding of breach, Cassidy was entitled to consequential damages, including anticipated lost profits, for Snyder's wrongful failure to ship. See id. §§ 12A:2-713, 2-715 (West 1962).
 
 
 82
 Snyder claims that it was entitled to halt delivery of the equipment because Cassidy had materially breached the contract by failing to pay for previously delivered goods within thirty days of their shipment. Each purchase order as well as Snyder's various sales manuals set forth a payment term of "net 30 days." The course of performance between the parties, however, reveals payments were consistently made approximately ninety days after shipment. The record reveals only one month during the contract period when Cassidy paid its account before the expiration of ninety days. When Snyder refused to deliver the equipment, the Cassidy account covering the New Jersey Bell contract was not yet ninety days past due. Section 2-208(3) of the N.J. U.C.C. states that "such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance." Id. § 12A:2-208(3) (West 1962).
 
 
 83
 Snyder's acquiescence in this course of performance amounted to a waiver of the thirty-day payment term.[11] Snyder, however, could have retracted its waiver, thus entitling Snyder to demand payment for the past shipments before the expiration of ninety days. Section 2-209 of the N.J. U.C.C. provides:
 
 
 84
 A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.
 
 
 85
 Id. § 12A:2-209(5) (West 1962) (emphasis added). Under this provision, although Snyder could have retracted its waiver with respect to future shipments, it could not demand compliance with respect to past shipments. Thus, Snyder could not declare that Cassidy breached the contract by failing to pay for the past shipments on thirty-day terms and Snyder was not entitled to withhold future shipments on this basis. Though Snyder could have retracted its waiver, a jury could plausibly find such a retraction to be unjust under the circumstances present here.
 
 
 86
 Even if there was no waiver by course of performance and Cassidy technically breached the contract by failing to pay on thirty-day terms, Snyder's right to withhold delivery is affected by the installment nature of the contract. The N.J. U.C.C. provides:
 
 
 87
 Whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract, there is a breach of the whole.
 
 
 88
 Id. § 12A:2-612(3) (West 1962). This raises the question of whether Cassidy's failure to pay for previous installments on thirty-day terms constituted a "substantial impairment" of the contract. Substantial impairment is a question of fact. Graulich Caterer Inc. v. Hans Holterbosch, Inc., 101 N.J.Super. 61, 243 A.2d 253 (1968).
 
 
 89
 Thus, in Gulf Chem. & Metallurgical Corp. v. Sylvan Chem. Corp., 126 N.J.Super. 261, 314 A.2d 73 (1973) (per curiam), certif. denied, 64 N.J. 507, 317 A.2d 720 (1974), the buyer failed to pay for the first shipment in an installment contract involving three shipments and the seller refused to deliver the remaining shipments until the buyer paid for the first shipment. The court resolved the issue under § 2-612(3) of the N.J. U.C.C., finding that the buyer's failure to pay for the initial installment did not constitute a substantial impairment of the contract. The court held the seller liable for the buyer's loss of profits caused by the seller's failure to deliver. Id. 314 A.2d at 74. Similarly, Cassidy's failure to pay in thirty days did not entitle Snyder to withhold the remaining shipments.
 
 
 90
 Additionally, Cassidy's failure to pay on thirty day terms would not constitute a substantial impairment of the contract unless Snyder exercised its right to seek adequate assurance of payment from Cassidy. The Uniform Commercial Code Official Comment notes that if the seller's security with respect to payment for "future installments is impaired, he has the right to demand adequate assurances of proper future performance [sic] but has not an immediate right to cancel the entire contract." N.J.Stat.Ann. § 12A:2-612, Uniform Commercial Code Comment. Section 2-609 of the N.J. U.C.C. states:
 
 
 91
 When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
 
 
 92
 Id. § 12A:2-609(1) (West 1962). After receipt of a "justified demand," failure to provide assurances within thirty days is a breach of the contract. Id. § 12A:2-609(4).
 
 
 93
 In light of Snyder's acquiescence in Cassidy's payment on ninety-day terms, a reasonable jury could find that Snyder was not justified in demanding adequate assurance of payment before the expiration of this time period. This conclusion is reinforced by evidence on this record that also indicates Cassidy was making periodic payments at Snyder's request and had already paid Snyder approximately $250,000.00 under the New Jersey Bell contract and other contracts during the past year. Further, while Snyder was negotiating payment alternatives with Cassidy, there is no evidence that Snyder actually demanded and failed to receive adequate assurances.
 
 
 94
 For the foregoing reasons, the jury was justified when it found that Snyder breached its contract with Cassidy by refusing to deliver the remaining equipment. In the absence of recovery on its franchise claim, Cassidy is certainly entitled to damages for breach of contract. However, the evidence on damages Cassidy suffered because of Snyder's breach is not so clear that we can determine their amount as a matter of law. That is a fact yet to be found. Accordingly, we cannot direct entry of judgment for Cassidy in any specific amount. Therefore, the jury's failure to determine the amount of damages Cassidy suffered as a result of Snyder's breach of its obligation to supply Cassidy with the equipment Cassidy needed to fulfill the New Jersey Bell contract requires a remand for a new trial limited to damages.[12]
 
 B.
 
 95
 Finally, on Snyder's claim that Cassidy failed to pay the agreed price for goods delivered in connection with the New Jersey Bell contract, we will affirm the directed verdict in Snyder's favor on its counterclaim in the amount of $89,804.00. In its briefs, Cassidy does not dispute that this equipment was shipped to it. Likewise, it does not contest either the price or the fact of non-payment. Since the evidence that Cassidy received this equipment and has never paid the agreed price is not rebutted or realistically contested on this appeal, we hold that on this record no rational jury could have found for Cassidy on Snyder's counterclaim. Therefore, we will affirm the district court's entry of judgment for Snyder in the amount of $89,804.00, but subject it to whatever set-off Cassidy is found to be entitled to on remand for its claim of non-delivery.
 
 VII.
 
 96
 The district court's order denying Snyder's motion for judgment n.o.v. on Cassidy's franchise claim will be reversed. The judgment entered in favor of Snyder on its counterclaim for the price of goods delivered to Cassidy will be affirmed. The order denying Cassidy a new trial on its claim that Snyder breached its contract to supply goods to Cassidy for the New Jersey Bell contract will be vacated and that claim will be remanded to the district court for a new trial limited to damages. Any damages awarded to Cassidy on remand will be set-off by Snyder's counterclaim of $89,804.00.
 
 
 
 *
 Hon. Thomas N. O'Neill, Jr., District Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The appeal and cross-appeal also question various other aspects of the district court's final order which our disposition makes it unnecessary to reach or decide. They are set out in our summary of the portions of the district court order that are the subject of this appeal and cross-appeal
 
 
 [2]
 The New York office location served two separate corporations--Cassidy, Podell, Lynch of New Jersey and Cassidy, Podell, Lynch of New York. This case concerns only the New Jersey corporation. Therefore, we need not consider the activities of Cassidy's New York corporation
 
 
 [3]
 Because this action was filed before May 18, 1989, the required amount in controversy is $10,000.00. Jones v. Keene Corp., 933 F.2d 209, 211 n. 1 (3d Cir.1991). Cassidy originally asserted federal question jurisdiction pursuant to 28 U.S.C.A. §§ 1331 and 1337 (West 1986) on its anti-trust claims, but they have been voluntarily dismissed
 
 
 [4]
 Although in this case the Repair Depot Agreement was entirely separate from the Distributorship Agreement, we think Snyder's additional use of Cassidy as an authorized repair center is relevant and material in determining the consuming public's view of a sufficient connection between Cassidy and Snyder to satisfy the license requirement under the New Jersey Franchise Act
 
 
 [5]
 Cassidy submitted evidence that approximately ninety-five percent of its sales in 1984 were attributable to Snyder
 
 
 [6]
 Cassidy implicitly concedes lack of evidence to show it made any investment in Snyder products other than the units it bought for immediate resale, for example the products secured for delivery to New Jersey Bell
 
 
 [7]
 We recognize, of course, that the statute does require a place of business in a fixed location. That specific minimal requirement and its relation to the more general "community of interest" requirement is discussed in Part V.B. of this opinion, infra
 
 
 [8]
 Although Cassidy's representatives operated out of their residences, residences are expressly excluded from the statutory definition of "place of business." See id
 
 
 [9]
 The Distributorship Agreement provided that Cassidy shall "[e]stablish and maintain sales facilities and employ trained salesmen ... in appropriate locations in the Territory...." Distributorship Agreement, p 5(b)
 
 
 [10]
 Because of Cassidy's failure to produce evidence sufficient to meet the "community of interest" and "place of business" requirements of the New Jersey Franchise Act, it is not necessary for us to decide whether Cassidy met the gross sales requirement of the statute, see N.J.S.A. § 56:10-4, or the propriety of including the "purchase for resale" transactions, specifically excluded from the terms of the Distributorship Agreement, in its gross sales calculation. It is likewise unnecessary for us to consider the issues the parties raise concerning a new trial on the franchise claim, pre-judgment interest, attorney's fees, the amount of the remittitur or the district court's instructions to the jury on the franchise claim itself
 
 
 [11]
 Under the N.J. U.C.C., a provision in a contract prohibiting waiver except by a signed writing has no effect. See N.J.Stat.Ann. § 12A:2-209(4) (West 1962); see id., New Jersey Study Comment Four. Thus, the provision in the Distributorship Agreement prohibiting waiver except by written agreement, Distributorship Agreement, p 14, would not prevent a waiver by course of performance in this case
 
 
 [12]
 While Cassidy's cross-appeal seeks entry of judgment for $70,000.00, Cassidy contends in its brief that the evidence presented at trial demonstrates that it lost $75,000.00 in anticipated profits. See Brief for Appellee/Cross-Appellant Cassidy at 49. Cassidy will be given the chance to present evidence of the exact amount on remand