**NEW JERSEY AMERICAN, INC., Appellant,**

v.

**The ALLIED CORPORATION and its Bendix Aftermarket Brake Division and its Allied Aftermarket Division, Appellee.**

No. 88–5312.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Rule 12(6) Sept. 15, 1988.

Decided May 17, 1989.

Harold E. Kohn, William B. Lytton, Joseph C. Kohn, and Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., for appellant.

Nicholas DeB. Katzenbach, Susan Scott, Robert J. Gilson, and Riker, Danzig, Scherer, Hyland & Perretti, Morristown, N.J., for appellee.

Before BECKER, HUTCHINSON and SCIRICA, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

Plaintiff-appellant New Jersey American, Inc. ("NJA") assembles automobile brake disc pads and drum shoes and sells them in the automotive replacement parts market. An important component of disc pads and drum shoes is the brake lining. Defendant-appellee The Allied Corporation ("Allied") is a manufacturer of the Bendix brand of brake linings, which it supplied to NJA for six years, until Allied terminated its business relationship with NJA. NJA brought suit in the district court for the District of New Jersey alleging, *inter alia,* that Allied's termination had violated the New Jersey Franchise Practices Act ("Act"), N.J. Stat.Ann. §§ 56:10–1 to 10–15 (West 1989), which proscribes the termination of franchise agreements without good cause.[1]

After discovery, the district court granted summary judgment for Allied on the ground that the good cause requirement of the Act was inapplicable because NJA had not presented evidence from which a reasonable fact finder could conclude that

1. The jurisdiction of the district court was founded on 28 U.S.C. §§ 1331 and 1337 (1982), 18 U.S.C. § 1964 (1982), 15 U.S.C. § 15 (1982), and pendent jurisdiction.

NJA was a franchisee of Allied within the meaning of the Act. NJA appealed, and the principal question before us on this appeal is whether NJA was a franchisee. Our review is plenary. *See E.E.O.C. v. City of Mt. Lebanon,* 842 F.2d 1480, 1485 (3d Cir.1988).

The case presents an extremely close question of construction of the Act, and particularly of the meaning of its requirement that there be a "community of interest" between franchisor and franchisee for a franchise to exist within the meaning (and protection) of the Act. Indeed, this case is at the dead center of the countervailing views that forged the New Jersey Act. No New Jersey case gives us significant guidance and the legislative history is of little help. As will be seen, the question is whether, in the absence of direction from the New Jersey Supreme Court, we should apply a test which focuses more on NJA's investment in the brake products industry, in which case NJA looks more like a franchisee (since there was such investment), or in its specific investment in Allied, in which case NJA looks less like a franchisee (since there was no such investment). The test to be devised is, of course, a caliper for measuring putative inequality of bargaining power, which is what the community of interest test, in effect, seeks to measure.

For the reasons that follow, we conclude that the district court was correct in determining that a reasonable fact finder could not find that NJA is a franchisee. Hence we will affirm.[2]

## I. THE FACTS OF RECORD

From 1980 to November 15, 1986, Allied supplied NJA with Bendix brand brake linings. In 1986, NJA had gross sales of $13,591,626. Sales of brake parts incorporating Bendix linings accounted for 38% of its gross sales. However, sales of brake parts incorporating linings manufactured by Fasa Friction Laboratory Inc. ("Fasa") accounted for 43% of its gross sales. Joseph Fresta, the president and founder of NJA, is also the president and 50% owner of Fasa. Sales of brake parts incorporating linings manufactured by six other companies accounted for the remaining 18% of NJA's gross sales. From 1980 through 1986, NJA purchased linings from fourteen companies other than Allied.

Allied's sale to NJA of the Bendix linings was conditioned upon NJA's compliance with the Friction Materials Agreement ("Agreement") drafted by Allied. The Agreement was not a sales contract; rather, it set the terms under which future agreements to sell would be made. The Agreement permitted NJA to advertise that it sold brake parts incorporating Bendix linings, to include this information on the cartons of the brake parts that it assembled, and to display the Bendix trademark on point of sale displays, stationery, and business cards when selling brake parts incorporating Bendix linings. The Agreement did not, however, require NJA to use the Bendix trademark or advertise, and it left NJA with complete freedom to set prices for the disc pads and drum shoes that it sold and to market these brake parts in any way that it saw fit (consistent with the limitations on NJA's right to use the Bendix trademark).

The Agreement required NJA to conform to Allied's engineering specifications when assembling brake parts incorporating Bendix linings and to carry liability insurance covering such brake parts. Prior to entering into the Agreement, and periodically thereafter, Allied inspected NJA's facilities, reviewed its quality control and reviewed its financial statements. The Agreement stated that NJA was an "independent contractor" and not an agent or

---

**2.** In addition to appealing the district court's grant of summary judgment for Allied on NJA's Franchise Practices Act claim, NJA appeals the district court's grant of summary judgment for Allied on (1) NJA's claim under the RICO Act, 18 U.S.C. §§ 1961 to 1968 (1982 & Supp. IV 1986), and (2) Allied's counterclaim regarding NJA's failure to pay for Bendix linings delivered by Allied. We have considered these contentions of NJA but find them lacking in merit, and we will affirm the district court's summary judgment on these claims. Nothing in our opinion should be construed as prejudicing NJA's right to pursue its state law fraud and misrepresentation claims, which the district court dismissed without prejudice.

legal representative of Allied and provided that either party could terminate the Agreement by giving the other thirty days prior notice in writing. The Agreement did not prevent NJA from purchasing brake linings from other manufacturers and did not mandate that NJA invest in Bendix-specific capital equipment or good will.

While the Agreement did not require Allied to reimburse NJA for advertising brake parts incorporating Bendix linings, Allied often reimbursed NJA for such advertising as a matter of marketing strategy, as long as the advertising met certain requirements. Pursuant to the Agreement, NJA chose to include the Bendix brand name on the cartons of its brake parts that incorporated Bendix linings. These cartons conformed to Allied's instructions on the use of its trademark and informed the purchaser that the brake part was manufactured using Bendix linings. With respect to brake parts that did not use Bendix linings, NJA's cartons did not advert to the brand of brake linings used. There is also record evidence from which a reasonable fact finder could conclude that NJA purchased machinery and other capital equipment in reliance upon assurances by Allied that Allied would continue to sell NJA Bendix linings.

Allied terminated NJA on October 9, 1986, as part of a comprehensive restructuring of its Bendix linings marketing strategy. Prior to the implementation of its new strategy, Allied had signed Friction Materials Agreements with over 100 assemblers. Allied determined, however, that it was losing market share to its competitors because Allied's more than 100 assemblers could not compete with Allied's principal national competitors, which sold (and continue to sell) assembled brake products to major retailers and other large accounts on a national basis though a single sales force. In response to the perceived need to centralize its sales efforts, Allied decided to stop selling its Bendix linings to assemblers and to start selling only assembled brake products. Rather than operate assembly facilities itself, Allied contracted with ten of the assemblers with which it had Friction Materials Agreements and arranged for them to meet all of Allied's assembling needs. NJA was one of the many assemblers not selected and like the other assemblers not selected, was given written notice on October 9, 1986 that Allied would no longer sell Bendix linings to it after November 15, 1986. Allied has not argued that NJA breached the Friction Materials Agreement or that the quality of its work was deficient in any respect.

## II. THE FRANCHISE PRACTICES ACT

The New Jersey Franchise Practices Act provides, in pertinent part, that it shall be a violation of the Act for a franchisor to terminate a "franchise without having first given written notice setting forth all the reasons for such termination ... at least 60 days in advance of such termination." N.J. Stat.Ann. § 56:10–5. It is also a violation of the Act to terminate a franchise without "good cause." *Id.* "Good cause" for terminating a franchise is defined as a "failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." *Id.*

The Act defines "franchise" as "a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise." *Id.* § 56:10–3(a). The Act does not define the key phrases "grant[ ] ... a license" and "community of interest."

The Act does not apply to all franchises, and the Act's description of the franchises to which the Act is inapplicable may provide some clue as to the meaning of the Act's definition of franchise. The Act applies only

> to a franchise (1) the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey, (2) where gross sales of products or ser-

vices between the franchisor and franchisee covered by such franchise shall have exceeded $35,000.00 for the 12 months next preceding the institution of suit pursuant to this act and (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise.

*Id.* § 56:10-4.

## III. THE DISTRICT COURT'S HOLDING

Allied has contended not that NJA fell into the class of franchisees excluded from the protection of the Act but that NJA possessed no franchise as that term is defined in N.J.Stat.Ann. § 56:10-3(a). The district court agreed, holding that a jury could find that Allied had granted NJA a license to use the Bendix name, but that the record would not support a jury finding that a community of interest existed between Allied and NJA. The question whether Allied complied with the notice and good cause requirements of the New Jersey Act was therefore irrelevant because the evidence did not permit a reasonable fact finder to find that NJA was a franchisee within the meaning of the Act.

With respect to the license requirement, the district court explained that Allied had authorized NJA to use the Bendix name in packaging and advertising and that the manner in which NJA was allowed to display the Bendix name would allow a reasonable jury to find that Allied had " 'create[d] a reasonable belief on the part of the consuming public that there is a connection between [Allied and NJA by which Allied] vouches.' " Dist.Ct.Op. at 15 (quoting *Neptune T.V. & Appliance Service, Inc. v. Litton Microwave Cooking Products Division*, 190 N.J.Super. 153, 160, 462 A.2d 595, 599 (App.Div.1983)).

With respect to the community of interest requirement, however, the district court noted that NJA had merely proffered evidence that both it and Allied profited when NJA sold brake pads and shoes (because an NJA sale probably meant that NJA would purchase more linings from Allied). The district court reasoned that NJA had not shown that it was economically dependent on Allied, as NJA had purchased and could purchase linings from many other linings manufacturers. In finding no community of interest, the district court also relied on the fact that the president of NJA had a 50% ownership interest in Fasa, NJA's principal linings supplier other than Allied.

## IV. DISCUSSION

In passing the Franchise Practices Act, New Jersey has created an exception to the general rule that two businesses are free to terminate their business relationship according to the terms of their contract. We must decide whether the business relationship between NJA and Allied fell into the category still subject to the general rule or into the category that the New Jersey legislature has deemed worthy of special regulation under the Act. For purposes of discussion, we will assume that Allied did grant a license and focus on the community of interest element of the Act's definition of a franchise.

### A.

Two cases have construed the community of interest element of the New Jersey Act. In *Neptune T.V.*, 190 N.J.Super. 153, 462 A.2d 595, the Appellate Division of the Superior Court held that Neptune, an appliance repair firm and Litton's authorized service source, which was permitted to represent itself as such in its advertising, letterheads and business cards, did not share a community of interest with Litton within the meaning of the Act's definition of a franchise. Noting that the Act does not define community of interest, the court concluded that "its import can be understood in the context of the nature of franchising and the abuses to which this form of business enterprise is singularly susceptible and which were intended to be remedied" by the Act. 190 N.J.Super. at 161, 462 A.2d at 600. The court determined that the business arrangement between Neptune and Litton "lacked, in substantial measure, both the symbiotic character of a true franchise arrangement and the consequent vulnerability of the alleged franchisee to an

unconscionable loss of his tangible and intangible equities." 190 N.J.Super. at 165, 462 A.2d at 601. As a firm that repaired appliances manufactured by many firms other than Litton, Neptune did not have any significant specific investment in capital equipment that could only be used to repair Litton appliances. With respect to the intangible asset of good will, the court concluded that "Neptune's service reputation did not accrue to enhance Litton's reputation as an appliance manufacturer upon the termination of the contract." 190 N.J. Super. at 167, 462 A.2d at 603.

In *Colt Industries Inc. v. Fidelco Pump & Compressor Corp.*, 844 F.2d 117 (3d Cir.1988), we held that a manufacturer and one of its distributors, which shared certain advertising costs with the manufacturer and provided warranty service for its products, did not share a community of interest within the meaning of the New Jersey Act, because the distributor failed to establish that it did not have "equal bargaining power" with the manufacturer and thus "failed to establish that it was subject to the whim, direction and control of a more powerful entity whose withdrawal from the relationship would shock a court's sense of equity." *Id.* at 120–21. We concluded that "a community of interest means more than the mere fact that two parties share in the profits realized when a product makes its way from manufacturer to the ultimate consumer" and that to prove a community of interest, the putative franchisee must present "specific proof, focusing on certain indicia of control by the supposed franchisor over the supposed franchisee." *Id.* at 120.

The two cases that have construed the Act's "community of interest" element have thus construed it narrowly, to ensure that the Act reaches only those licensing relationships which, in the language of *Neptune*, are "singularly susceptible" to the type of abuses intended to be remedied by the Act. As the *Neptune* court recognized in its focus on "unconscionable loss of ... tangible and intangible equities," the peculiar tension in the franchise relationship is that a true franchisee devotes much of its capital to investments that are only

valuable to it if it remains a licensee. In addition to the value of such tangible investments as a building designed to meet the style of the franchise, special equipment useful only to produce the franchise product, and franchise signs, a franchisee may lose such intangibles as business good will if it is forced to move from its business premises or change its name and product line upon termination by the franchisor.

The franchisee's often substantial specific investment thus creates an opportunity for post-contract opportunistic behavior by the franchisor. The franchisor can threaten to close down the franchisee at any time regardless of the cost to the franchisee, and this threat may be sufficient to allow the franchisor to divest the franchisee of the profits that would be produced by the franchisee's specific investment. That a franchisee frequently sells or services only the product line of the franchisor makes the franchisee particularly vulnerable to a forfeiture of the expected returns from its specific capital investment, as such investment may often make up a large part of the franchisee's capital assets.

The structure of the franchisee's investment therefore obviates, in the language of *Colt Industries*, "equal bargaining power" between the franchisor and the franchisee. *See generally* Klein & Saft, *The Law and Economics of Franchise Tying Contracts*, 28 J.Law & Econ. 345, 356 (1985) ("Postcontract ... a franchisor can use the threat of termination to 'hold up' a franchisee that has made a specific investment in the marketing arrangement."); Makar, *In Defense of Franchisors: The Law and Economics of Franchise Quality Assurance Mechanisms*, 33 Vill.L.Rev. 721, 760 (1988) ("Termination often leaves the franchisee with specialized inventories and franchise-specific capital assets. These assets may have litte or no value outside of their use in the particular franchise. Consequently, termination could impose a substantial financial burden on the franchisee." (footnote omitted)); Williamson, *Credible Commitments: Using Hostages to Support Exchange*, 73 Amer.Econ.Rev. 519, 529 (1983) ("[F]ranchisee[']s ... investments in transaction spe-

cific capital ... 'creates a situation where termination ... impose[s] a capital loss on him up to the amount of his initial non-salvageable investment.' " (citation omitted)). While the market provides some check on a franchisor's confiscatory attempts to divest the franchisee of its expected return from the franchise relationship (a franchisor's bad reputation for mistreating franchisees may make potential future franchisees wary of entering into a franchise relationship with it), the New Jersey legislature could have found this market check inadequate.

Although the legislative history of the New Jersey Act is of limited use in determining when a licensor and licensee fail to share a community of interest and hence fail to fall within the Act's definition of a franchise, the legislative history is consonant with understanding the concept of "equal bargaining power" discussed in *Colt Industries* as relating to the franchisee's need for special protection from post-contract franchisor confiscation of the franchisee's expected return from its specific investment in the franchisor's business. Assemblyman Peter Thomas, Chairman of the Judiciary Committee which held hearings on the proposed bill and the leading interrogator of persons who testified before the Committee, stated, in response to a bill proponent's claim that franchisors unfairly refuse to negotiate an individual franchise agreement with each franchisee, that "there is nothing that says you have to become [a franchisee]. The real area that disturbs me is the pressure that can be brought after you have involved yourself with an investment in a business...." *Public Hearing Before Assembly Judiciary Committee on Assembly Bill No. 2063 (Franchise Practices Act)* 114 (March 29, 1971).

### B.

Determining the reach of the New Jersey Act is no easy task. The Act's vague "community of interest" language and sparse legislative history make it difficult to determine the scope of the Act. As our prior opinion in *Colt Industries* makes

clear, however, we are not persuaded that every licensee is a franchisee within the meaning of the New Jersey Act; that would make the community of interest element of the franchise definition superfluous.

In the instant case, the district court relied, in part, on the fact that the president and founder of NJA, Joseph Fresta, is also the president and 50% owner of Fasa, a competitor of Allied in the brake linings market. Fresta's role as a competitor of Allied is significant to a community of interest inquiry, as it would seem unlikely that two competitors could share a community of interest. We do not, however, place conclusive weight on this fact: a corporation which, for example, owned a small chain of restaurants which competed with a national franchise restaurant chain could also own a franchise of the national chain. Although not conclusive, we consider Fresta's role as competitor as one factor in our analysis.

The district court also relied on the fact that only 38% of NJA's gross sales were from sales of brake parts incorporating Bendix linings and that from 1980 through Allied's termination of NJA in 1986, NJA purchased linings from fourteen companies other than Allied. Like the district court, we believe these facts highly relevant to the community of interest inquiry. *See supra* at 62. NJA's dependence on Allied was quite limited; Allied was only one of NJA's many brake linings suppliers and was not even the largest of them, as sales of brake parts incorporating linings manufactured by Fasa accounted for 43% of NJA's gross sales. Although we do consider this factor, we cannot place too much weight on it, since N.J.Stat.Ann. § 56:10–4, *see supra* at 60–61, by excluding from the Act's reach a *franchisee* that derives 20% or less of gross sales from its franchisor, implies that a firm may be a franchisee even if only 21% of its gross sales are derived from the franchisor.

There is one additional factor we think important. NJA presented no evidence that it was required to undertake substantial specific tangible or intangible invest-

ments in Allied's business. NJA presented no evidence that it was required to invest in capital equipment that could not be used to produce disc pads and drum shoes incorporating readily available linings manufactured by firms other than Allied. Indeed, Allied presented uncontradicted evidence that from an engineering standpoint, linings manufactured by different firms are interchangeable (although they may vary in price and quality). Because NJA can readily use its plant to produce brake products that incorporate non-Bendix linings, any leverage that Allied had "to turn the screws" on NJA after the two firms entered into a Friction Materials Agreement had nothing to do with NJA's status as Allied's licensee: if Allied had threatened to reduce the return that NJA had expected to receive on the contract, NJA was as free to walk away as would any firm that had invested capital in anticipation of the continuation of a business relationship. Thus injury done to NJA's business by Allied's termination, if any, was not the result of post-contract opportunistic behavior on the part of Allied as putative franchisor, as Allied had no more leverage over NJA than would any company that NJA had anticipated would continue to supply it with components.

While any firm may expand its operations in anticipation of maintaining a business relationship with a customer or supplier, the leverage created by this type of possible dependence is not that which the Franchise Practices Act apparently seeks to protect against. Rather, the Act's protection against post-contract opportunistic behavior on the part of licensors is only for the benefit of licensees and does not reach any other type of business relationship. The implication that we draw from this limitation in the Act's reach is that any possible leverage that the putative franchisor may have over the putative franchisee must stem from the franchisee's status as licensee rather than the necessary fact that the two firms do business together.

In this case there is no evidence that NJA invested in Bendix-specific capital equipment. Nor did NJA present evidence that it invested, through advertising or other means, in good will that was forfeited by the termination of its connection with Allied. Indeed, other than testimony that NJA attended a trade show at which it attempted to market its brake products that used Bendix linings, NJA has not presented any evidence suggesting that it underwrote any significant advertising or other marketing effort with respect to brake products using Bendix linings. Attendance at a single trade show, however, cannot be sufficient to transform a licensee into a franchisee. Consequently, this is not a case in which one could infer from a licensee's specific investment that the licensing agreement countenanced such investment.

In sum, the problem in this case is that it is not obvious how to draw a line between a licensee which does and a licensee which does not share a "community of interest" with its licensor. As we have explained, inequality of bargaining power between licensee and licensor would seem relevant, as it was this problem that the New Jersey legislature was likely addressing. Our prior opinion in *Colt Industries* suggests that unequal bargaining power is relevant to the inquiry or perhaps at the heart of it. What makes this case hard is that there is evidence from which a reasonable fact finder could conclude that New Jersey American invested in its business in expectation of Allied continuing to do business with it. Such investment, although not specific to Allied itself, could have given Allied leverage over New Jersey American if New Jersey American stood to lose some of the expected return from that investment if Allied terminated it. On the other hand, it is plain that the investment was of such a nature that it would be tremendously useful to New Jersey American for making brake products incorporating other brands of brake linings, including those of NJA's president, Mr. Fresta. For the reasons explained *supra* at 64, we have concluded that it would best effectuate the purposes of the New Jersey Act for our inquiry to focus here on whether Allied has devoted resources to Bendix-specific investments.

The problem is further complicated by the focus of the Act on the agreement between the parties: a test for inequality of bargaining power must operate at the time of the agreement, although the real problem in the franchise relationship is the potential for abuse after the franchisee has devoted considerable resources to the franchisor's business. We have dealt with this problem by focusing on whether the agreement between the licensee and licensor contemplates such future investment. That approach, to some extent, fudges the issue, but in the absence of guidance from the New Jersey courts, we are unable to devise an approach that better effectuates what we believe to be the purposes underlying the New Jersey Act.

Applying the foregoing legal analysis, we conclude that the record would not enable a reasonable fact finder to conclude that NJA and Allied shared a community of interest within the meaning of the New Jersey Act. Since (1) NJA has relied on many brake linings manufacturers, including one which is closely tied with NJA itself through a link of common ownership and control, to supply it with the majority of its linings needs; (2) these manufacturers remain readily available to meet NJA's linings demand; and (3) it cannot be inferred that the licensing agreement between NJA and Allied contemplated that NJA would invest in Bendix-specific capital equipment or good will (as it does not so provide and NJA did not undertake such investment), NJA has not presented evidence from which a reasonable fact finder could conclude that it was "subject to the whim, direction and control of a more powerful entity whose withdrawal from the relationship would shock a court's sense of equity." *Colt Industries*, 844 F.2d at 120–21. At bottom, we are satisfied that NJA simply was not in the type of vulnerable position that motivated the New Jersey legislature to pass the Franchise Practices Act. The judgment of the district court will be affirmed.