**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 22-1710 & 22-1885
_____

GOLDEN FORTUNE IMPORT & EXPORT CORPORATION,

v.

MEI-XIN LIMITED; MAXIM CATERERS LIMITED

Appellants
_____

On Appeal from the United States
District Court for the District of New Jersey
(Civil No. 2:22-CV-01369)
District Judge: Honorable Julien Xavier Neals
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
August 4, 2022
_____

Before: GREENAWAY, JR., MATEY, and NYGAARD, *Circuit Judges*.

(Opinion Filed: August 5, 2022)

_____

OPINION*

_____

* This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

GREENAWAY, JR., *Circuit Judge*.

When evaluating a motion for a preliminary injunction, the gatekeeping issues to resolve are whether the movant is likely to be successful on the merits and is more likely than not to suffer irreparable harm should we deny its request. Here, Golden Fortune Import & Export Corporation ("Golden Fortune") argues that it satisfies every requirement to secure a preliminary injunction against the termination of its Distribution Agreement ("Agreement") with Mei-Xin (Hong Kong) Limited ("Mei-Xin"). We disagree. We will reverse based on Golden Fortune's failure to show a likelihood of success on the merits and irreparable harm.

## I.     BACKGROUND

Plaintiff-Appellee Golden Fortune is a distributor of Asian groceries—and quite a successful one at that. Boasting over "40 years of experience sourcing high quality products," it imports and distributes 1,599 products from over 150 brands, including its own stand-alone brand, throughout the United States. J.A. 723 ¶¶ 4-5. It also offers service logistics, marketing, and warehousing services to its customers.

Defendant-Appellant Mei-Xin is a Hong Kong company that manufactures internationally renowned mooncakes[1] and other pre-packaged bakery products. When

---

[1] A mooncake "is the quintessential food consumed and/or gifted during one of China's most important holidays—the Mid-Autumn Festival"—which "takes place annually, falling sometime between September and October." J.A. 179 ¶ 17.

Mei-Xin decided to expand to the United States in 2000, it engaged Golden Fortune along with another company[2] to distribute its products and to develop a market for the brand there. Through their two-decade-long business relationship, Golden Fortune has enabled Mei-Xin to become the number one mooncake brand in the eastern United States. Golden Fortune has benefited as well. In the only fiscal year for which Golden Fortune provided its financial information (September 1, 2018 to August 31, 2019), Mei-Xin products accounted for $3,959,887—or 8.6%—of Golden Fortune's $45,720,201 in gross sales.

In 2021, the parties entered their most recent Distribution Agreement, which is the subject of this appeal. As relevant here, the Agreement provides that Golden Fortune will sell Mei-Xin "Mooncakes and Pre-packaged Bakery Products" in the eastern United States and Panama. J.A. 225 §§ 4-5. It covers the period from May 1, 2021 to April 30, 2022. There are two means for early termination. First, either party has the "right to terminate this Agreement during the Term by giving the other thirty-day (30) day [*sic*] written notice." J.A 229 § 7.1. Second, Mei-Xin has the unilateral right to "terminate . . . immediately without notice" if Golden Fortune fails to comply with "any provision." J.A. 229 § 7.2(a). In addition, the Agreement contains an arbitration clause providing for

---

[2] Chevalier International (USA) Inc. was responsible for the western United States, while Golden Fortune was responsible for the eastern United States.

3

the arbitration of "[a]ny dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or invalidity thereof." J.A. 231 § 20.

In 2017, Golden Fortune's annual sales growth of Mei-Xin's products began experiencing a significant decline. In 2020, Mei-Xin warned Golden Fortune that it would exercise its discretion to replace Golden Fortune with another distributor if there was not adequate improvement. When that improvement did not occur, Mei-Xin purported to terminate the Agreement via email on January 21, 2022. Golden Fortune asserted that the termination was insufficient under Sections 7.1 and 11 of the Agreement, prompting Mei-Xin to send another notice of termination on March 3, 2022.

This time, Golden Fortune claimed that the termination was invalid under the New Jersey Franchise Practices Act ("NJFPA"). The NJFPA "define[s] the relationship and responsibilities of franchisors and franchisees in connection with franchise arrangements." N.J. Stat. Ann. § 56:10-2 [hereinafter § 56:10-2]. It was enacted "to protect franchisees from unreasonable termination by franchisors that may result from a disparity of bargaining power[.]" *Id.* Consistent with its protective purpose, it prohibits franchisors from terminating a franchise "without good cause." § 56:10-5. In Golden Fortune's view, Mei-Xin failed to satisfy the good cause requirement.

Asserting that the NJFPA is inapplicable, Mei-Xin reiterated its purported termination and engaged a replacement distributor. In response, Golden Fortune commenced this action in the District Court for the District of New Jersey on March 14,

2022 against Mei-Xin and its parent company, Maxim's Caterers Limited ("Maxim's"). Golden Fortune alleged three causes of action: (1) violation of the NJFPA, (2) breach of the implied covenant of good faith and fair dealing, and (3) tortious interference. In addition, Golden Fortune sought a declaratory judgment that it continues to be Mei-Xin's exclusive distributor and that all previous termination efforts were invalid. Lastly, Golden Fortune filed a motion for a preliminary injunction seeking to prohibit Mei-Xin and Maxim's from terminating the Distribution Agreement and from engaging any other distributor in the eastern United States.

Although it found that the dispute was arbitrable, the District Court granted Golden Fortune's motion for a preliminary injunction. The District Court ordered that the parties enter an "alternative security arrangement" under which Golden Fortune would purchase 17% more product annually from Mei-Xin. J.A. 44-45. The preliminary injunction and security agreement are to remain effective until the parties complete arbitration. On April 18, 2022, Mei-Xin and Maxim's filed a timely notice of appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a).

"In reviewing the grant or denial of a preliminary injunction, we employ a tripartite standard of review: findings of fact are reviewed for clear error, legal conclusions are reviewed de novo, and the decision to grant or deny an injunction is

5

reviewed for abuse of discretion." *Osorio-Martinez v. Att'y Gen. U.S.*, 893 F.3d 153, 161 (3d Cir. 2018) (quoting *Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015)).

## III. DISCUSSION

We disagree with the District Court's grant of a preliminary injunction in favor of Golden Fortune. Golden Fortune has not shown a likelihood of success on the merits or that it will more likely than not suffer irreparable harm in the absence of the grant of a preliminary injunction.

### A. Preliminary Injunction

Preliminary injunctive relief is an "extraordinary remedy" that "should be granted only in limited circumstances." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)). In determining whether to grant a request for injunctive relief, courts consider four factors. These factors are: (1) whether the movant has shown "a reasonable probability of eventual success in the litigation"; (2) whether the movant "will be irreparably injured . . . if relief is not granted"; (3) "the possibility of harm to other interested persons from the grant or denial of the injunction"; and (4) whether granting the preliminary relief will be in "the public interest." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)).

6

The first two factors are the "most critical." *Id.* at 179. They are "gateway factors," meaning that failure to satisfy them ends the inquiry. *Id.* Once the gateway factors are met, the court, "in its sound discretion," should balance all four factors. *Id.* at 176.

### i. Likelihood of Success on the Merits

A likelihood of success "requires a showing significantly better than negligible but not necessarily more likely than not." *Id*. at 179 (citing *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc)).

Here, Golden Fortune has alleged that Mei-Xin's termination of the Distribution Agreement violates the good cause standard under the NJFPA. *See* § 56:10-5. This claim turns on whether the NJFPA applies to Golden Fortune. The District Court concluded it does. We disagree for two primary reasons. First, Golden Fortune and Mei-Xin do not share the requisite community of interest. *See* § 56:10-3(a). Second, 20% of Golden Fortune's annual gross sales are not derived from Mei-Xin. *See* § 56:10-4(a).

### 1. Community of Interest

The NJFPA defines franchise as "a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a *community of interest* in the marketing of goods or services at wholesale, retail, by lease, agreement, or

7

otherwise." § 56:10-3(a) (emphasis added).  Golden Fortune cannot satisfy the "community of interest" element.

The lynchpin of the community of interest element—and the NJFPA more generally—is the vulnerability of the purported franchisee.  *See, e.g.*, *N.J. Am., Inc. v. Allied Corp.*, 875 F.2d 58, 65 (3d Cir. 1989) (observing that the New Jersey legislature enacted the NJFPA to protect the "vulnerable position" of franchisees); *Westfield Ctr. Serv., Inc. v. Cities Serv. Oil Co.*, 86 N.J. 453, 466 (N.J. 1981) (explaining that "[r]estoration of the loss accords with the legislative desire to protect the innocent franchisee when the termination occurs at the franchisor's convenience").  We consider several factors bearing on the purported franchisee's vulnerability in determining whether this element is satisfied.  They include: the "(1) [the] licensor's control over the licensee, (2) the licensee's economic dependence on the licensor; (3) disparity in bargaining power, and (4) the presence of a franchise-specific investment by the licensee."  *Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp.*, 944 F.2d 1131, 1140 (3d Cir. 1991).

The first factor—control—requires that the purported franchisee act at the "whim, direction and control of a more powerful entity whose withdrawal from the relationship would shock a court's sense of equity."  *Colt Indus. Inc. v. Fidelco Pump & Compressor Corp.*, 844 F.2d 117, 120–21 (3d Cir. 1988).  Indicators of control include sales quotas

and whether advertising and promotional materials provided to the purported franchisee are merely suggested as opposed to required. *Id.*

The second factor—economic dependence—refers to "the complex of mutual and continuing advantages which induced the [purported] franchisor to reach his ultimate consumer through entities other than his own which, although legally separate, are nevertheless economically dependent upon him." *Cassidy Podell Lynch, Inc.*, 944 F.2d at 1141 (quoting *Neptune T.V. & Appliance Serv., Inc. v. Litton Microwave Cooking Prods. Div.*, 462 A.2d 595, 600-01 (N.J. Super. Ct. App. Div. 1983)). Relying on a "single supplier" does not "automatically" render a distributor economically dependent on that supplier for purposes of the NJFPA. *Id.* at 1141-42. The parties must intend to create a franchisor-franchisee relationship when entering the business agreement. *Id.*

The third factor—disparity in bargaining power—means that the purported franchisor has "become[] dependent as a result of the relation itself." *Id.* at 1142. It does not exist ex ante. Instead, it occurs when the purported franchisee has been "induce[d] or require[d] . . . to invest in skills or assets that have no continuing value to" the franchisee if the business relationship is terminated. *Id.* The fourth and final factor refers to "any significant specific investment in capital equipment [by the purported franchisee] that could only be used" for the benefit of the purported franchisor. *Id.*

The District Court concluded that a community of interest existed between Golden Fortune and Mei-Xin. In doing so, it relied primarily on perceived mutual advantages:

Golden Fortune developed a client base for Mei-Xin in the eastern United States, and Mei-Xin gained access to Golden Fortune's supermarkets and wholesale customers. In our view, these allegations do not suffice and the above factors weigh against finding a community of interest.

We begin with control. The Distribution Agreement is an ordinary commercial contract, and not "so burdensome as to create the unfettered control typically present in a franchise relationship." *Id.* at 1141. While Mei-Xin did provide some guidance to Golden Fortune as to marketing, these were not requirements. Instead, Golden Fortune kept its promise to "work together with [a] brand's in-house marketing team." J.A. 724 ¶ 13.

As for economic dependence, the District Court correctly identified some mutual advantages stemming from the Distribution Agreement. However, that Golden Fortune came to rely exclusively on Mei-Xin for its mooncakes does not transform the Distributor Agreement into a franchisor-franchisee relationship where that intent did not appear to exist for either party in the first place. *Cassidy Podell Lynch, Inc.*, 944 F.2d at 1141-42. The facts here indicate a lack of economic dependence: Golden Fortune distributes approximately 1,598 products aside from Mei-Xin's mooncakes, and Mei-Xin products account for only 8.6% of Golden Fortune's annual revenue.

Nor has Golden Fortune become so dependent on Mei-Xin as to create a disparity in bargaining power. Golden Fortune did not invest in skills that have no continuing

value beyond the Distribution Agreement. Indeed, the Agreement offered Golden Fortune one of many opportunities to "sourc[e] high quality products"—a practice that Golden Fortune has been engaged in for 40 years. J.A. 723 ¶ 4. Nor did Mei-Xin require Golden Fortune to invest in assets. Lastly, although Golden Fortune has invested in marketing programs specific to Mei-Xin, those alone do not warrant a different result. Taken together, these factors indicate that Golden Fortune and Mei-Xin do not share the community of interest required under the NJFPA. *See* § 56:10-3(a).

### 2. 20% Gross Sales Requirement

Further, Golden Fortune does not meet the 20% gross sales requirement. The NJFPA applies only "(2) where gross sales of products . . . between the franchisor and franchisee . . . have exceeded $35,000.00 for the 12 months next preceding the institution of suit pursuant to this act, and (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from [the] franchise." § 56:10-4(a)(2)-(3).

We must decide whether the "12 months next preceding the institution of suit" clause applies to both subsections (a)(2) and (a)(3). We interpret the provision "consistent with its plain meaning." *Oberhand v. Dir., Div. of Taxation*, 193 N.J. 558, 568 (N.J. 2008) (citation omitted). We must also construe remedial statutes like the

11

NJFPA "broadly to give effect to their legislative purpose." *Liberty Lincoln–Mercury v. Ford Motor Co.*, 134 F.3d 557, 566 (3d Cir. 1998).

While the District Court concluded no temporal limitation applies, we think the better reading is that "20% of a franchisee's gross sales *over a 12-month period* are intended to be or are derived from the franchise." Unlike § 56:10-4(a)(2), which places a 12-month limitation on the $35,000 gross sales requirement, § 56:10-4(a)(3) contains no temporal limitation. Nonetheless, the canon of consistent usage indicates that we should also apply the 12-month limit to subsection (a)(3). Pursuant to that canon, "[a] term appearing in several places in a statutory text is generally read the same way each time it appears." *United States v. Scott*, 14 F.4th 190, 197 (3d Cir. 2021) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994)). Both subsections (a)(2) and (a)(3) reference "gross sales" requirements. Because "gross sales" in subsection (a)(2) refers to gross sales over a 12-month period, we should read "gross sales" in subsection (a)(3) as referring to a 12-month period as well.

If there were any ambiguity, the context confirms our interpretation. *See King v. Burwell*, 576 U.S. 473, 486 (2015) (explaining that we "read the words [of a statute] 'in their context'" and do not construe "isolated provisions") (citations omitted). Section 56:10-3(a) defines a "franchise" as "a written arrangement for a definite or indefinite

12

period."  Here, the Distribution Agreement is for a term of 12 months.  It follows that we should consider "gross sales" over that period for purposes of the 20% requirement.

Lastly, our interpretation is consistent with the purpose of the NJFPA, which is to "protect franchisees from unreasonable termination by franchisors that may result from a disparity of bargaining power[.]"  § 56:10-2.  Reading a 12-month limitation into the 20% gross sales requirement does just that: it offers security to franchisees that depend on a franchisor for the success of their business.  By contrast, distributors who rely on several different supply streams are less likely to need protection if one supplier terminates the business relationship.

Applying the 12-month limitation, Golden Fortune has not satisfied the 20% gross sales requirement.  Between September 1, 2018 and August 31, 2019, Golden Fortune derived $3,959,887—or 8.6%—of its $45,720,201 in gross sales from Mei-Xin.  Golden Fortune urges us to focus only on the "peak sales season for MX Mooncakes"—namely, the three-month period surrounding the Mid-Autumn Festival during which 24% of Golden Fortune's gross sales were derived from Mei-Xin.  J.A. 192 ¶ 91.  We decline to do so.  That approach poses an inconsistent usage problem.  It disregards that the Distribution Agreement covers a 12-month period and contemplates distribution of a myriad of non-seasonal Mei-Xin products apart from the mooncake.  Lastly, it does not

13

further the protective purpose of the NJFPA: without the Mei-Xin mooncake, Golden Fortune can still make 91.4% of its gross sales and distribute 1,598 other products.

### ii. Irreparable Harm

The District Court held that Golden Fortune's allegations of irreparable harm were sufficient. **J.A. 36.** Specifically, Golden Fortune alleged that it was set to lose (1) its investment in the promotion of Defendants' products, entire good will and market share for MX Mooncakes; and (2) all the sales of its other products that routinely are purchased by Asian supermarkets alongside their mooncake orders. We disagree.

To establish irreparable harm, there must be "a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat.'" *Acierno v. New Castle Cnty.*, 40 F.3d 645, 655 (3d Cir. 1994) (citation omitted). The mere "risk of irreparable harm is not enough." *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). Further, the alleged harm "must be of a peculiar nature, so that compensation in money cannot atone for it." *Acierno*, 40 F.3d at 653 (internal quotation marks and citation omitted).

It follows that economic loss, including a "temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *see also Acierno*, 40 F.3d at 653. For instance, in *Frank's GMC Truck Center, Inc.*, we reversed the grant of a preliminary injunction where a franchisor ceased supplying some of its products, and a franchisee argued that its inability to sell those products would make potential customers "more reluctant" to purchase the

14

remaining products. *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988). We concluded that the loss of "sales and service customers, and therefore profits," was not irreparable harm. *Id.*

Such losses can rise to the level of irreparable harm only where they would "force[] [the business] to shut down." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 802 (3d Cir. 1989). As our precedent makes clear, this threshold is a significant one. In *Instant Air Freight Co.*, we concluded that there was no irreparable harm where a company stood to lose 80% of its business from the termination of a business agreement. *Id.* That 20% of the business survived meant that the company would not be "forced into bankruptcy." *Id.* We also noted that the company was "free to secure other business," and the contract at issue would terminate in under two years regardless of our decision. *Id.*

Even where allegations of economic injury are coupled with allegations of non-economic injury, a preliminary injunction is nonetheless inappropriate where money damages are adequate. *Id.* Apart from losing a substantial portion of its business, the plaintiff in *Instant Air Freight Co.* also alleged the loss of "many if not all of its employees, and its goodwill and reputation in the industry." *Id.* at 798-99, 801. In holding that money damages were sufficient in *Instant Air Freight Co.*, we relied on three factors. First, that "[m]oney damages . . . should be provable with reasonable certainty given the" two-decades-long business relationship. *Id.* at 802. Second, we considered

15

that the company could "procur[e] suitable substitute performance by means of money awarded as damages," which would "compensate [the business] fully for its lost profits and other injuries it may prove." *Id.* (quoting Rest. (Second) of Contracts § 360 (Am. L. Inst. 1981)). Third, we concluded that the money damages were collectable given the supplier's high annual revenue. *Id.*

At bottom, Golden Fortune argues that it "stand[s] to lose sales and . . . customers, and therefore profits," which does not qualify as irreparable harm. *Frank's GMC Truck Ctr., Inc.*, 847 F.2d at 102. Further, this is not a scenario where termination of the Distribution Agreement would "force[] [Golden Fortune] to shut down." *Instant Air Freight Co.*, 882 F.2d at 802. Golden Fortune imports and distributes at least 1,599 products and sells over 150 brands as well as its own brand. In all, Mei-Xin products constitute only 8.6% of its $45 million in annual revenue. In light of our prior holding that losing 80% of one's business does not constitute irreparable harm, we are hard pressed to hold that Golden Fortune has made the requisite showing here. *See id.*

To be sure, the "loss of control of reputation, loss of trade, and loss of goodwill" may constitute irreparable harm in some contexts. *See, e.g.*, *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990)). To the extent that a plaintiff alleges these harms, we require it to demonstrate that its business "is different from other types of commerce in such a way that normal breach of contract remedies

16

could not provide a remedy." *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008); *see also Pappan Enters., Inc.*, 143 F.3d at 807 (holding that the "right of the public not to be deceived or confused" warrants a preliminary injunction where two parties were using the same trademark) (quoting *Opticians Ass'n of Am.*, 920 F.2d at 197); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 589-90, 596 (3d Cir. 2002) (holding that a preliminary injunction is warranted where a false or misleading ad would produce consumer confusion, resulting in a "loss of market share" "[i]n a competitive industry where consumers are brand-loyal").

Where the alleged harms stem from the termination of a business agreement, we require evidence that the moving party has not been able to perform on contracts with third parties because of the loss, or for it to point to a loss of goodwill or reputation with specific customers. *See Bennington Foods LLC*, 528 F.3d at 179. Indeed, the harm caused must be direct. It is not enough for the claim to be "two-step," meaning (1) because the supplier is not distributing, the distributor cannot distribute, and (2) the lack of the delivery harms the reputation with third parties who do not receive the distribution. *Id.* at 180. That is a standard breach of contract case, and "there is no reason to make the extended causal inferences necessary to find irreparable harm to reputation." *Id.*

Although Golden Fortune has also alleged non-economic harms, such as the loss of good will and market share, the adequacy of monetary damages weighs against a

17

finding of irreparable harm.  Money damages are readily ascertainable given the two-decades-long history between Golden Fortune and Mei-Xin.  *Id.*  Money damages would allow Golden Fortune to seek substitute performance, which will fully compensate it—especially because other companies have mirrored the quality of Mei-Xin mooncakes, "narrowing [] the gap between MX Mooncakes and competitor brands" over the years.  J.A. 873 ¶ 13.  Lastly, there is a high likelihood that money damages will be collectable given the international success of Mei-Xin and Maxim's.  *See Instant Air Freight Co.*, 882 F.2d at 802.

Because Golden Fortune has failed to demonstrate that its business "is different from other types of commerce" or cite specific instances of the loss of good will from its inability to distribute Mei-Xin products, we have no reason to depart from our general rule.  *Bennington Foods LLC*, 528 F.3d at 179.  Any allegations of a loss of good will are exactly the kind of "two-step" claims we have previously rejected.  *See id.* at 180.

## IV.    CONCLUSION

For these reasons, we will reverse the order of the District Court based on Golden Fortune's failure to satisfy the requirements for a preliminary injunction.